UNITED STATES of America
v.
Elliott KAHANER, Antonio Corallo, Robert M. Erdman, James Vincent Keogh, and Sanford J. Moore, Defendants.

United States District Court
S. D. New York.
May 4, 1962.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, New York City, for United States, William G. Hundley, John F. Lally, Henry S. Ruth, Jr., Sp. Attys., Dept. of Justice, of counsel.

William W. Kleinman, Brooklyn, N. Y., for defendant, Elliott Kahaner.

John P. McGrath, New York City, for defendant, James Vincent Keogh, Henry G. Singer, Brooklyn, N. Y., C. Joseph Hallinan, Jr., New York City, of counsel.

WEINFELD, District Judge.

The Government's consent to a severance of the indictment as to the defendants Erdman and Moore dissolves most of the problems stressed in support of the renewed motions for separate trials made by the defendants Kahaner and Keogh. The Government states that it is ready to proceed to trial against the three remaining defendants, Kahaner, Keogh and Corallo. Keogh, however, presses for an individual trial, separate and apart from Kahaner and Corallo. But nothing contained either in his present or prior motion papers suggests that in the changed posture of the case a joint trial with them will be to his prejudice; accordingly, this aspect of the motion is denied.

So, too, with respect to the renewed motion by the defendant Keogh to inspect and copy his grand jury testimony, no matter has been presented which requires any change from the original disposition. The Court, after due considera-

tion of all contentions then advanced in support of the motion, concluded there had been no showing of compelling need for the minutes as to justify lifting the veil of grand jury secrecy.[1] The defendant now urges that the Government itself has lifted the veil but, as shown in the following discussion of the motion to dismiss the indictment, the record does not support the charge. Accordingly, the motion to inspect the grand jury minutes is again denied.

■ Finally, the defendant Keogh moves for dismissal of the indictment, relying upon allegations contained in an affidavit by one of his attorneys and exhibits attached thereto.[2] This branch of the motion rests in the main upon a charge that pre-indictment publicity which appeared in the metropolitan area was "the result of some leak," and that the source was the Government. However, this general accusation made by the attorney is not supported by any evidential matter, but rests upon his inference drawn from some of the newspaper articles which attributed their source to unidentified "officials." The special assistant to the Attorney General who has been in charge of this prosecution since its inception categorically denies that the Government leaked any information to the press or to any unauthorized person while the matter was under consideration by the grand jury or at any other time. In addition to this denial, he further swears that, from the onset of the inquiry which resulted in the indictment, the Department of Justice took every possible step to prevent newspaper speculation about matters under investigation by the grand jury; that knowledge of the case was limited to as few Department of Justice personnel as necessary to conduct the investigation; that reports were handled on a confidential basis; that grand jury witnesses were requested not to discuss their testimony except with their attor-

1. United States v. Kahaner, 203 F.Supp. 78 (S.D.N.Y.1962).

2. The defendant Kahaner upon argument joined in this motion and subsequently filed an affidavit and exhibits in support thereof.

neys; that grand jurors were constantly reminded of their obligation of secrecy; and finally, that inquiries conducted within the Department of Justice as to the source of the stories in publications failed to disclose any breach of secrecy in the handling of the case by Government personnel. In the face of this unequivocal affidavit (which finds support in some of the news articles referring to "a facade of absolute official silence" and "the Justice Department [refusal] to comment"), the allegation by defendant's counsel that the Government was the source of the leaks, resting as it does upon surmise and conjecture, is clearly conclusory and without substantiation.

Neither is there any basis for the claim by the defendant's attorney that somehow the pre-indictment publicity may have influenced the grand jury to return the indictment—that a leak to the press of an investigation, to use his words, "might well materially impair the ability of a grand jury to vote a 'no true bill' even if they thought such 'no true bill' proper." It must be presumed that the grand jury followed the court's instructions as to its powers, duties and obligations and that each grand juror fully lived up to and observed his solemn oath. Indeed there is a strong presumption of regularity accorded to the deliberations and findings of grand juries.[3]

This indictment was returned December 7, 1961 and upon the defendants' arraignment they were given until January 15, 1962 to make all motions addressed to this indictment. Significantly, while the defendants herein moved for multiple relief within the prescribed time, they did not then move to dismiss the indictment although fully aware of the pretrial publicity and its alleged prejudicial effect. The instant motion was not made until shortly before May 7th, which date, after conference with counsel on March 27th, had been tentatively set for the commencement of trial. And even at this late date the record is barren of any evidence that any grand juror was prejudiced, coerced or influenced by any publicity which may have appeared during the course of the investigation.[4] The grand jury, before voting to return the true bill, heard, in addition to other witnesses, the defendant Keogh himself.[5] However much pre-indictment publicity may be deplored,[6] upon the record here presented there is no legal ground for dismissal of the indictment.[7] The further charges attributing to Government officials improprieties in the presentation of matters before the grand jury, also urged in support of the motion to dismiss the indictment, are entirely unsubstantiated and speculative and merit no discussion. The motion to dismiss the indictment is denied.

Finally, the defendant Kahaner moves for a continuance of trial until September 1962, based upon the publica-

3. United States v. Nunan, 236 F.2d 576, 594 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); United States v. Weber, 197 F.2d 237, 238 (2d Cir. 1952).

4. Compare Beck v. United States, 298 F.2d 622 (9th Cir. 1962); United States v. Foster, 80 F.Supp. 479, 482 (S.D.N.Y.1948). Cf. Stroble v. California, 343 U.S. 181, 195, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (petit jury).

5. Cf. United States v. Nunan, 236 F.2d 576, 593 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957).

6. In England the pre-indictment publicity would probably have brought judicial censure and punishment. See cases cited in Maryland v. Baltimore Radio Show, 338 U.S. 912, 921–936, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (Appendix, separate opinion). See also, Goodhart, Newspapers and Contempt of Court in English Law, 48 Harv.L.Rev. 885 (1935). However, we have not yet met head-on the issue posed by the asserted right of the press under the First Amendment to publish (apart from a fair and accurate report of trial proceedings) matters before and during a trial which may be prejudicial to a defendant and impinge upon his constitutional right to a fair trial. See Mr. Justice Frankfurter's concurring opinion in Irvin v. Dowd, 366 U.S. 717, 729, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

7. See United States v. Dioguardi, 20 F.R.D. 33, 35 (S.D.N.Y.1956). Cf. Beck v. United States, 298 F.2d 622, 627 (9th Cir. 1962).

tion in all metropolitan papers on April 9th and 10th of an affidavit by Moore or the substance thereof wherein he made serious charges against Kahaner. The publicity followed the granting of the defendant Keogh's motion in the United States District Court for the Eastern District of New York to unseal the file of Moore's application to withdraw his plea of guilty to an indictment there and a later application for reduction of sentence. It would be naive indeed not to recognize, even apart from publication of Moore's affidavit, that the publicity surrounding the case both before and immediately following the return of the indictment underscores the court's duty to question jurors on the voir dire with painstaking care to assure the defendants an impartial jury and a fair trial.[8] Publicity, in and of itself, does not foreclose a fair trial. The courts do not function in a vacuum and jurors are not required to be totally ignorant of what goes on about them. We live in a world of reality. Serious accusations against public officers and public figures are bound to receive wide publicity through all avenues of modern communication; the public interest will be more than casual and it would be rare to find persons qualified to serve as jurors who have not heard or read of such matters. These are facts that cannot be downed. On the other hand, it is also a fact that frequently in this large metropolitan district prospective jurors show little recall of past widely publicized matters; fears that jurors have formed opinions often prove groundless; the impact of news items upon the public mind, depending upon their nature, may be more imaginary than real.[9] Further, impressions or even an opinion do not necessarily establish partiality or prejudice.[10] That a case has been the subject of extensive publication or even comment does not, in and of itself, require automatic continuance of a trial; if that were the rule it would mean that, unless the press voluntarily refrained from continuing publicity, cases involving public officers or public figures could never be brought to trial. The fundamental question remains no matter what the trial date—can a fair and impartial jury be obtained which will decide the issues in the case solely upon the evidence presented in the courtroom? Whether or not the publicity has been of such a nature [11] that the selection of a fair and impartial jury is foreclosed at this time cannot be determined until jurors are questioned on the voir dire.[12] The motion for continuance to September 1962 is denied; the trial date is set for May 14, 1962 at 10 A.M.

8. Cf. United States v. Bando, 244 F.2d 833, 838 (2d Cir.), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957).

9. Cf. United States v. Moran, 194 F.2d 623, 625 (2d Cir. 1952).

10. E. g., Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); United States v. Titus, 210 F.2d 210 (2d Cir. 1954).

11. The publicity here was not of the inflammatory or lurid nature considered or condemned in a number of Supreme Court cases. E. g., Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951) (concurring opinion). See also, Delaney v. United States, 199 F.2d 107 (1st Cir. 1952). With the exception of the accusatory statement against Kahaner contained in the published Moore affidavit, the news articles in substance parallel the charges contained in the indictment which, upon its return by the grand jury, became "public property," as did the fact of the defendants' arraignments and pleas of not guilty. Stroble v. California, 343 U.S. 181, 193, 79 S.Ct. 599, 96 L.Ed. 872 (1952); Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). It is also noted that seven months have elapsed from the date of the original publications in the press and with the exception of the early April 1962 publicity surrounding the Moore affidavit newspaper references to the case have abated.

12. Cf. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); United States v. Bando, 244 F.2d 833, 838 (2d Cir. 1957).